**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
aapton@zlk.com
388 Market Street, Suite 1300
San Francisco, CA 94111
Telephone: 415-373-1671
Facsimile: 212-363-7171

Mark S. Reich (admitted *pro hac vice*)
mreich@zlk.com
Courtney E. Maccarone (admitted *pro hac vice*)
cmaccarone@zlk.com
55 Broadway, 10th Floor
New York, NY 10006
Telephone: 212-363-7500
Facsimile: 212-363-7171

*Attorneys for Plaintiffs and the Proposed Classes*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHRISTOPHER CALISE and ANASTASIA GROSCHEN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>FACEBOOK, INC.,<br><br>Defendant. | Case No. 4:21-cv-06186-JSW<br><br>**DECLARATION OF MARK S. REICH IN SUPPORT OF PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>Date: February 25, 2022<br>Time: 9:00 a.m.<br>Courtroom: 5 – 2nd Floor<br>Hon: Jeffrey S. White |

I, Mark S. Reich, declare and state as follows:

1. I am a Partner at Levi & Korsinsky, LLP, counsel for Plaintiffs in this matter. I have personal knowledge of the facts set forth in this declaration, and, if called as a witness, I could and would testify competent to the matters set forth herein. I submit this declaration in support of Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss.

2. Attached hereto as **Exhibit 1** is a true and correct copy of a Brief for the State of Texas and 24 Other States as Amici Curiae In Support of Petitioner, Jane Doe, *Petitioner v. Facebook, Inc*., No. 21-459 (U.S. Oct. 15, 2021) [hereinafter "Brief for the State of Texas"].

3. Attorney General of Texas filed an amicus brief, arguing that the Texas Supreme Court followed wrongfully-decided precedent from the Ninth Circuit as to breadth of Section 230 protection, when it applied Section 230 immunity to allegations of allowing and benefitting from sex trafficking, and Facebook's failure to warn customers of the dangers of sex trafficking on its websites. Brief for the State of Texas at 2, 4, 10.

4. Attached hereto as **Exhibit 2** is a true and correct copy of a Brief of Amici Curiae Federal Trade Commission, Consumer Financial Protection Bureau, and North Carolina Supporting Reversal, *Henderson, et al., Plaintiffs-Appellants, v. The Source For Public Data, L.P., et al., Defendants-Appellees*, No. 21-1678 (4th Cir. Oct. 14, 2021) [hereinafter "Brief for the FTC"].

5. The FTC, CFPB and Attorney General of North Carolina filed an amicus brief, arguing that the court in the Eastern District of Virginia incorrectly provided overbroad protection for defendant's actions outside its capacity as a publisher and for first party information. Brief for the FTC at 17, 19.

6. Attached hereto as **Exhibit 3** is a true and correct copy of the Congressional Research Service Report by Valerie C. Brannon & Eric N. Holmes, *Section 230: An Overview,* CONGRESSIONAL RESEARCH SERVICE, (April 7, 2021), available at https://crsreports.congress.gov/product/pdf/R/R46751 (last visited December 6, 2021).

7. Exhibit 3 is a report on Section 230 by The Congressional Research Service describing how "legislators . . . have debated the proper scope of Section 230. [Some] have argued courts have

interpreted Section 230 immunity too broadly." CRS Overview at 2. The 116th Congress introduced 26 bills to amend the scope of Section 230 immunity, ranging from "outright repeal, to placing certain conditions on immunity, to creating narrower exceptions allowing certain types of lawsuits." *Id.*

8. Attached hereto as **Exhibit 4** is a true and correct copy of Daisuke Wakabayashi's article on NYTimes.com, *Legal Shield for Social Media Is Targeted by Lawmakers* (May 28, 2020; Updated Dec. 15, 2020), available at https://www.nytimes.com/2020/05/28/business/section-230-internet-speech.html (last visited December 6, 2021).

9. Exhibit 4 is an article discussing proposed changes to Section 230, where Senator Wyden suggests the legal shield was meant to accompany powers to remove offensive material, and without that removal, the legal shield makes little sense.

10. Attached hereto as **Exhibit 5** is a compilation of true and correct copies of public news articles regarding Facebook:

a. **Exhibit 5.1**: Karen Hao's article on MIT's technologyreview.com, *How Facebook and Google Fund Global Misinformation* (November 20, 2021), available at https://www.technologyreview.com/2021/11/20/1039076/facebook-google-disinformation-clickbait/ (last visited December 6, 2021).

b. Exhibit 5.1 is a third-party review of Facebook documents and papers that show how Facebook's "Instant Articles" and "Audience Network" programs encouraged rapid misinformation development and raised billions for Facebook in countries with tense political situations and developing nations while Facebook responded either too slowly or inadequately to deal with bad actors.

c. **Exhibit 5.2**: Darius Tahir's article on Politico.com, *Facebook political ad ban blocks pro-vaccine messages* (February 21, 2021), available at https://www.politico.com/news/2021/02/21/facebook-ad-pro-vaccine-ban-470304 (last visited December 6, 2021).

d. Exhibit 5.2 is an article describing Facebook's unilateral actions to categorize and control the placement of posts at its own discretion despite Facebook not being the author or originator of the posts.

e. **Exhibit 5.3**: Elizabeth Culliford & Fanny Potkin's article on reuters.com, *Facebook targets harmful real networks, using playbook against fakes* (September 17, 2021), available at https://www.reuters.com/technology/exclusive-facebook-target-harmful-coordination-by-real-accounts-using-playbook-2021-09-16/ (last visited December 6, 2021).

f. Exhibit 5.3 is an article reporting Facebook's announcement to implement more aggressive measures to shut down coordinated groups of real-user accounts engaging in activities it deems harmful on its platform, authorizing Facebook's security teams to take sweeping actions beyond the company removing posts or individual accounts.

g. **Exhibit 5.4**: Clare Duffy's article on cnn.com, *Facebook has known it has a human trafficking problem for years. It still hasn't fully fixed it* (October 25, 2021), available at https://www.cnn.com/2021/10/25/tech/facebook-instagram-app-store-ban-human-trafficking/index.html (last visited December 6, 2021).

h. Exhibit 5.4 is an article discussing Facebook's knowledge that human traffickers used its platforms since at least 2018, which prompted Apple to warn Facebook it would pull Facebook's apps off its App Store in 2019.

i. **Exhibit 5.5**: Barbara Ortutay's article on APNews.com*, Facebook parent Meta to remove sensitive ad categories* (November 9, 2021), available at https://apnews.com/article/technology-business-misinformation-marriage-religion-aeb83a4553c8c9c6a5b26819fbdbb7e1 (last visited December 6, 2021).

j. Exhibit 5.5 is an article in which NYU researchers from the Ad Observatory claimed Facebook wrongfully terminated their accounts after attempting to exert control over research that painted Facebook in a negative light.

k. **Exhibit 5.6**: Queenie Wong's article on CNet.com, *Facebook exec grilled by lawmakers over mental health impact on children* (September 30, 2021), available at

https://www.cnet.com/news/facebook-exec-grilled-by-lawmakers-over-mental-health-impact-on-children/ (last visited December 6, 2021).

l. Exhibit 5.6 is an article about a Senate hearing with one of Facebook's executives intended to "help lawmakers draft legislation that'll prompt social networks like Facebook to take action." The lawmakers compared Facebook's Instagram to Big Tobacco, notorious for hooking teens early on product use, by exploiting teens' desire to be popular.

m. **Exhibit 5.7**: Brian Witte's article on APNews.com, *Maryland congressman deactivates Facebook account* (October 27, 2021), available at https://apnews.com/article/technology-business-maryland-congress-facebook-cff94efaf809f29c923552be932c8514 (last visited December 6, 2021).

n. Exhibit 5.7 is an article about Democratic Rep. Dutch Ruppersberger deactivating his official congressional and campaign Facebook and Instagram accounts until the social media company and Congress made substantial reforms related to the statements and documents produced by a Facebook whistleblower as well as a Washington Post article detailing how Facebook's algorithm had, for a period of time, treated "angry" reactions to Facebook posts as five times more valuable than "likes," resulting in a disproportionate promotion of content likely to promote division.

o. **Exhibit 5.8**: Aaron Mackey's article on EFF.org, *Facebook's Pitch to Congress: Section 230 for Me, But not for Thee* (March 24, 2021), available at https://www.eff.org/deeplinks/2021/03/facebooks-pitch-congress-section-230-me-not-thee (last visited December 6, 2021).

p. Exhibit 5.8 is an article describing how Facebook attempted to persuade Congress to amend Section 230, such that an indeterminate third party would define "adequate systems" to oversee posted content that intermediary social media platforms must adopt. Because the vast majority of online services that host user-generated content do not have the necessary resources for such systems, Facebook's proposal "is an explicit plea to create a legal regime that only Facebook, and perhaps a few other dominant online services, could meet."

q. **Exhibit 5.9**: Taylor Hatmaker's article on techcrunch.com, *Facebook changes misinfo rules to allow posts claiming COVID-19 is a man-made* (May 28,2021), available at https://techcrunch.com/2021/05/28/facebook-covid-man-made-lab-theory/ (last visited December 6, 2021).

r. Exhibit 5.9 is an article describing how Facebook shut down any discussion of "lab-leak theory" after labelling it as misinformation, as part of its control of the messaging originated by others.

s. **Exhibit 5.10**: Cristiano Lima's article on WashingtonPost.com, *The Technology 202: Facebook shuttered a crucial tool for oversight. Lawmakers say it just made their jobs harder* (August 5, 2021), available at https://www.washingtonpost.com/politics/2021/08/05/technology-202-facebook-shuttered-crucial-tool-oversight-lawmakers-say-it-just-made-their-jobs-harder/ (last visited December 6, 2021).

t. Exhibit 5.10 is an article examining Facebook's shut down of access to information that researchers at New York University's Ad Observatory used to examine Facebook's advertising data. That information was later used to provide regular briefings to Congress about Facebook's practices at agencies such as the Federal trade Commission.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on December 6, 2021, at Nassau, New York By: *<u>/s/ Mark S. Reich</u>*
Mark. S. Reich