Adam M. Apton (State Bar No. 316506)
**LEVI & KORSINSKY LLP**
388 Market Street, Suite 1300
San Francisco, CA 94111
Telephone: 415-373-1671
Facsimile: 212-363-7171
Email: aapton@zlk.com

Mark S. Reich (admitted *pro hac vice*)
Courtney E. Maccarone (admitted *pro hac vice*)
**LEVI & KORSINSKY, LLP**
33 Whitehall, 17th Floor
New York, NY 10004
Telephone: 212-363-7500
Facsimile: 212-363-7171
Email: mreich@zlk.com
        cmaccarone@zlk.com

*Attorneys for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER CALISE and ANASTASIA GROSCHEN, Individually and On Behalf of All Others Similarly Situated,<br><br>           Plaintiffs,<br><br>    v.<br><br>META PLATFORMS, INC.,<br><br>           Defendant. | Case No. 4:21-cv-06186-JSW<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>(1) Breach of Contract<br>(2) Breach of the Covenant of Good Faith and Fair Dealing<br>(3) Negligent Failure to Warn<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Christopher Calise, Terri Bohl, and Noah Faerber ("Plaintiffs") bring this class action on behalf of (i) all individuals with an active Facebook account (the "Class") and (ii) all individuals with an active Facebook account who clicked on a Deceptive Facebook Ad (as defined below) and suffered harm (the "Damages Subclass") (collectively referred to hereinafter as the "Classes"). The complaint seeks monetary and injunctive relief against Defendant Meta Platforms, Inc. ("Meta" or the "Company").[1]

Plaintiffs, individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except to those allegations concerning Plaintiffs, which are alleged to be based upon personal knowledge. As to all other matters, Plaintiffs make the following allegation upon the investigation of counsel.[2]

## NATURE OF THE ACTION

1.      This case seeks to hold Meta liable for damages caused to Facebook users from Meta's practice of actively soliciting, encouraging, and assisting scammers it knew, or by the exercise of reasonable care, should have known, were using its Facebook platform to swindle Facebook users with deceptive and fraudulent advertisements for bait-and-switch and other schemes (the "Deceptive Facebook Ads"), and to compel Meta to either compensate those users for their losses or disgorge the billions of dollars in profits it unjustly earned from such misconduct. Additionally, this case seeks to compel Meta to implement remedial steps on the Facebook platform, including warnings, to more effectively protect Facebook users from Deceptive Facebook Ads in the future.

2.      Meta has long collected vast amounts of data from each Facebook user. While Meta does not pay users for it, this data has enormous financial value since it enables Meta to sell precisely targeted ads to millions of advertisers.

---

[1] Plaintiff Calise sought to address and resolve the allegations and relief sought in this complaint through a pre-suit demand, dated June 1, 2021, and subsequent discussions by and between counsel for Plaintiffs and Defendant.

[2] All emphasis herein is added, unless otherwise noted.

3.     Mining Facebook user data to sell targeted ads has been a mint for Meta, generating over $131 billion in advertising revenue in 2023 alone. In particular,  Meta's revenue from China—a major source of deceptive ads—was $13.69 billion, $7.40 billion, and $7.59 billion for the years ended December 31, 2023, 2022, and 2021, respectively. [3]  Meta has benefited financially from scammers advertising on its platform, including advertisers based in China, despite the company's stated efforts to combat fraud and deceptive advertising practices. Scammers discovered they could exploit Meta's targeting capabilities to get deceptive, false and/or misleading ads viewed by the Facebook users most likely to click those ads and be lured into, among other schemes, bait-and-switch scams where high-quality products are advertised, but cheap, low-quality items are shipped, and non-delivery scams, where the seller takes payment for products that never arrive.

4.     Given the foreseeability of material harm to Facebook users from scammers, Meta should have promptly shut down these scammers as soon as they started surfacing on its platform, or at a minimum provided users with adequate and sufficient warning of these risks.  Meta had a duty to do so given, among other factors, (i) promises in its Terms of Service to remove false and misleading ads, (ii) advertising policies strictly prohibiting such ads, and (iii) the vast investigative, technical, and financial capabilities and resources Meta had at its disposal to combat fraud. But Meta refused to drive scammers off its platform or adequately and sufficiently warn users about these risks because Meta was generating billions of dollars per year in revenue from deceptive ads.

5.     Meta has done much more than passively create and maintain a Facebook platform on which scammers can brazenly target users with scams.  According to internal Meta documents, and current and former Meta employees and contractors interviewed by various investigative journalists at prominent publications, Meta has actively solicited, encouraged, and assisted deceptive advertisers. On the revenue side, according to these investigations, Facebook's sales teams presented at conferences heavily attended by known scammers, socialized with known scammers for business development purposes, and met revenue quotas by encouraging known scammers to continue buying Facebook ads.

---

[3] Meta Platforms, Inc., Annual Report (Form 10-K) Sec. Filing No. 001-35551 (Date Feb. 1, 2024).

6. Meta's sales teams have also aggressively solicited ad sales in China and provided extensive training services and materials to China-based advertisers, despite an internal study showing that **nearly thirty percent (30%)** of the ads placed by China-based advertisers — estimated to account for $2.6 billion in 2020 ad sales alone — violated at least one of Facebook's own ad policies. Absent Meta's collaboration with China-based advertisers, these Chinese advertisers would have been unable to display Deceptive Facebook Ads to Meta's users due to the laws against using Meta's products in mainland China. Having been aware of an epidemic of violative ads and scammers operating out of China for years, Meta continued to aggressively recruit China-based advertisers even though it knew a material percentage of their ads were deceptive. In other words, Meta courted advertisers it knew or should have known were scammers.

7. On the enforcement side, according to these investigations, Meta has affirmatively directed employees and contractors tasked with monitoring the Facebook platform for deceptive ads to (i) ignore ads placed by hacked Facebook accounts and pages, as long as Meta gets paid for these ads, and (ii) ignore violations of Facebook's Ad Policies, especially by China-based advertisers (since Meta "want[s] China revenue").

8. In October 2020, the Federal Trade Commission ("FTC") reported that about 94% of the complaints it collected concerning online shopping fraud on social media identified Meta's Facebook platform (or its Instagram site) as the source.[4]

9. Cracking down on scammers would have jeopardized the billions of dollars per year in ad revenue that Meta has collected from scammers. Therefore, even as Meta's public relations team touted the closing of certain accounts and lawsuits targeting a few scammers, Meta has remained economically motivated to continue soliciting, encouraging, and assisting scammers at the expense of its users. As Tim Hwang, the author of a book on ad fraud, told Buzzfeed, "I

---

[4] *Press Release: FTC Data Shows Big Jump in Consumer Reports about Scams Originating on Social Media*, Federal Trade Commission (Oct. 21, 2020), https://www.ftc.gov/news-events/press-releases/2020/10/ftc-data-shows-big-jump-consumer-reports-about-scams-originating, (last visited on Dec. 20, 2024).

think the profit motive definitely makes it harder for [Facebook] to take real steps here."[5] Therefore, declaratory and injunctive relief is necessary to deter Meta's deliberately reckless conduct and prevent future harm to Facebook users.

10. The injunctive relief ("Proposed Injunctive Relief") that Plaintiffs seek includes, but is not limited to, directing Meta to implement and monitor changes to Meta's processes, practices, and policies to substantially reduce the display of Deceptive Facebook Ads on Facebook, protect Facebook users from being victimized by scam ads, and to provide adequate and sufficient warnings of these risks, including without limitation, implementing and monitoring changes to processes, practices, and policies with respect to:

(a) vetting new advertisers before permitting them to display ads – particularly prospective advertisers based in China and other countries where a material percentage of ads violate Facebook's ad policies;

(b) preventing repeat offenders from circumventing enforcement mechanisms to continue displaying scam ads (*e.g.*, through hacking and/or set-up of new Facebook accounts);

(c) promptly processing and responding to reports of scam ads submitted by Facebook users;

(d) removal of statements about Facebook's efforts to combat fraudulent or harmful ads until Facebook is capable of identifying and promptly removing such ads;

(e) educating users about the location and use of tools available to protect themselves against scam ads, and how to report scam ads to Meta;

(f) compensating Facebook employees and contractors tasked with monitoring Facebook for scam ads to ensure, among other things, that such employees and contractors are incentivized to prioritize protection of Facebook users

---

[5] Craig Silverman and Ryan Mac, *Facebook Gets Paid,* BUZZFEED NEWS (Dec. 10, 2020), https://www.buzzfeednews.com/article/craigsilverman/facebook-ad-scams-revenue-china-tiktok-vietnam (last visited on Dec. 19, 2024).

from deceptive ads without having to consider the ramifications of their actions on Meta's revenue;

(g)   compensating Facebook's sales, marketing, and business development teams to ensure, among other things, that such teams are not financially incentivized to solicit scammers or encourage scammers to continue purchasing Facebook ads (including but not limited a review of ad sales practices with respect to China and other countries where a material percentage of ads violate Facebook's ad policies); and

(h)   expanding Meta's existing Purchase Protection program for purchases made on the Facebook platform to victims who are tricked by scammers into fraudulent transactions occurring off of the Facebook platform.

11.   Plaintiffs seek monetary relief in the form of damages and/or disgorgement of profits unjustly earned by Meta and to hold Meta responsible for its wrongful conduct. By collecting troves of data from Facebook users without compensating them, and then earning vast sums from scammers who leveraged that data to target deceptive ads at vulnerable Facebook users, Meta breached legal and contractual duties owed to its users, and unjustly enriched itself at their expense.

12.   Plaintiffs also seek injunctive relief and compensatory damages for Meta's failure to warn its users of the risk of third-party advertisers posting, disseminating, sharing, and targeting advertisements for deceptive and fraudulent websites in furtherance of efforts to dupe Meta's users with Deceptive Facebook Ads.

13.   Plaintiffs bring claims against Meta for breach of contract; breach of the covenant of good faith and fair dealing; and negligent failure to warn.

## PARTIES

14.   Plaintiff Christopher Calise is a citizen and resident of the State of Oregon and is over the age of eighteen years. Mr. Calise has had a Facebook account since 2009.

15.   Plaintiff Terri Bohl is a citizen and resident of the State of Ohio and is over the age of eighteen years. Ms. Bohl has had a Facebook account since 2007.

16.     Plaintiff Noah Faerber is a citizen and resident of the State of California and is over the age of eighteen years. Mr. Faerber has had a Facebook account since approximately 2009.

17.     Meta is a publicly-traded, Delaware corporation with its principal place of business located within this District at 1 Hacker Way, Menlo Park, California 94025.

18.     Meta conceived, reviewed, approved, directed, and controlled the misconduct alleged herein in California; and collected the revenue wrongfully earned from such misconduct in California.

19.     Meta owns, operates, controls, produces, designs, maintains, manages, develops, tests, labels, markets, promotes, supplies, and distributes digital available through mobile-and web-based applications, including Instagram and Facebook.

**JURISDICTION, VENUE, AND CHOICE OF LAW**

20.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §1332(d)(2), the Class Action Fairness Act of 2005, because at least one member of the Class, which exceeds 100 members in the aggregate, is a citizen of a different state than Facebook and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

21.     This Court has personal jurisdiction over Meta because it transacts business in this State, and because the tortious conduct alleged in this Complaint occurred in, was directed to, and/or emanated from California.

22.     Venue is proper in this District under 28 U.S.C. §1391 because Meta is headquartered in this District, and conducts business transactions in this District, and because the wrongful conduct giving rise to this case occurred in, was directed from, and/or emanated from this District.

# FACTUAL ALLEGATIONS

## A. The User Data Fueling Meta's Advertising Revenue

23.     Meta is the world's largest social media company, providing its users with social networking services that enable them to connect and communicate with family, friends and colleagues concerning subjects of common interest. One of Meta's social media products is the Facebook platform.

24.     As of September 4, 2024, Meta reported 3.065 billion monthly active users, and 2.11 billion daily active users of Facebook.[6] The Facebook platform has become such a staple of 21st-century life — with huge numbers of people relying on it daily for news, product recommendations, and social interaction — that many politicians and academics have characterized it as a public utility.[7] Indeed, in a 2007 interview with Time, Meta's CEO, Mark Zuckerberg, himself characterized Facebook as a "social utility."[8]

25.     Meta does not charge Facebook users for its services. Instead, it generates virtually all of its revenue from selling advertising to businesses seeking to market their products and services to Facebook users. During 2023, Meta generated $131 billion in advertising revenue.[9]

26.     Facebook had over 7 million active monthly advertisers as of July 2, 2021.[10]

---

[6] *Facebook User & Growth Statistics – Key Facebook Statistics*, BACKLINKO (Sept. 4, 2024), https://backlinko.com/facebook-users#facebook-key-stats (last visited Dec. 19, 2024).

[7] *See also* Dipayan Ghosh, *Don't Break Up Facebook—Treat It Like a Utility*, HARVARD BUSINESS REVIEW (May 30, 2019), https://hbr.org/2019/05/dont-break-up-facebook-treat-it-like-a-utility (last visited on Dec. 19, 2024); Anjana Susarla, *Facebook shifting from open platform to public utility*, UPI (Aug. 17, 2018), https://www.upi.com/Top_News/Voices/2018/08/17/Facebook-shifting-from-open-platform-to-public-utility/1721534507642/ (last visited on Dec. 19, 2024); Ryan Grim, *Steven Bannon Wants Facebook and Google Regulated Like Utilities*, THE INTERCEPT (July 27, 2017), https://theintercept.com/2017/07/27/steve-bannon-wants-facebook-and-google-regulated-like-utilities/ (last visited on Dec. 19, 2024).

[8] Lauren Locke, *The Future of Facebook*, TIME (July 17, 2007), http://content.time.com/time/business/article/0,8599,1644040,00.html (last visited on Dec. 19, 2024).

[9] Meta Platforms, Inc., Annual Report (Form 10-K) Sec. Filing No. 001-35551 (Date Feb. 1, 2024)

[10] Facebook for Business, *Insights to Go*, FACEBOOK, https://www.facebook.com/iq/insights-to-go/6m-there-are-more-than-6-million-active-advertisers-on-facebook (last accessed Dec. 19, 2024).

27.    Meta leverages user data to show the right ads to the right people. Mark Zuckerberg, the CEO and co-founder of Meta, testified before the Senate's Commerce and Judiciary Committees on April 10, 2018:

> What we allow is for advertisers to tell us who they want to reach, and then we do the placement. So, if an advertiser comes to us and says, 'All right, I am a ski shop and I want to sell skis to women,' then we might have some sense, because people shared skiing-related content, or said they were interested in that, they shared whether they're a woman, ***and then we can show the ads to the right people***. . ."[11]

28.    To fulfill its promise to advertisers to target the right ads at the right people, Meta collects massive amounts of data concerning its users. For example, on December 27, 2016, the investigative nonprofit, ProPublica, reported that it had identified more than 52,000 unique interest categories used by Facebook to classify its users (such as interests in different types of food, stores, clothing, movies, etc.).[12] These interests were inferred by Facebook in part based on the actions that users took while they were logged in to Facebook, such the pages they had liked or ads they had clicked. As ProPublica explained: "Every time a Facebook member likes a post, tags a photo, updates their favorite movies in their profile, posts a comment about a politician, or changes their relationship status, Facebook logs it."[13]

29.    Meta also collects information about pages that users visited outside of the Facebook platform. For example, the Facebook pixel is a small piece of code that businesses put

---

[11] *See* Facebook, Social Media Privacy, and the Use and Abuse of Data, SENATE COMMERCE AND JUDICIARY COMMITTEES, 115th Congress, S. Hrg. 115-683 (Apr. 10, 2018), video available at: https://www.commerce.senate.gov/2018/4/facebook-social-media-privacy-and-the-use-and-abuse-of-data (last visited Dec. 19, 2024)

[12] Julia Angwin, Surya Mattu and Terry Parris Jr., *Facebook Doesn't Tell Users Everything It Really Knows About Them,* PROPUBLICA (Dec. 27, 2016), https://www.propublica.org/article/facebook-doesnt-tell-users-everything-it-really-knows-about-them (last visited on Dec. 19, 2024). *See also Facebook Ad Categories*, PROPUBLICA DATA STORE (Dec. 2016), https://www.propublica.org/datastore/dataset/facebook-ad-categories (last visited on Dec. 19, 2024).

[13] Julia Angwin, Terry Parris Jr. and Surya Mattu, *Breaking the Black Box: What Facebook Knows About You*, PROPUBLICA (Dec. 28, 2016), https://www.propublica.org/article/breaking-the-black-box-what-facebook-knows-about-you (last visited on Dec. 19, 2024).

on their website to track what pages users have visited, and what purchases they have made, and match this data back to Facebook user profiles for the purpose of displaying ads.[14]

30.     Whenever a user logs into the Facebook platform, Facebook's software accesses the data it had collected on that user to determine what ads to display. The selection process takes the form of an online auction in which advertisers compete to show their ads to a particular Facebook user whom Meta predicts (based on user data) would be interested in those ads. Billions of these auctions occur every day (each taking milliseconds).[15]

31.     The set of instructions that Facebook's software follows to determine which ads to display to a particular user is known as an algorithm. Facebook's ad algorithm weighs three factors: (i) an advertiser's bid, (ii) estimated action rate, and (iii) ad quality. The "estimated action rate" is the algorithm's estimate of how likely a particular user is to click, view or otherwise engage with a particular ad based on that user's data points, while "ad quality" is a variable based on feedback from various sources concerning the text and images in an ad.[16]

**B. Facebook's Terms of Service**

32.     Section 1 of Facebook's Terms of Service ("TOS")[17] — titled "The services we provide" — provided in relevant part:

> Our mission is to give people the power to build community and bring the world closer together. To help advance this mission, we provide the Products and services described below to you….
>
> **Combat harmful conduct and protect and support our community:**
>
> People will only build community on Facebook if they feel safe. ***We employ dedicated teams around the world and develop advanced technical systems to***

---

[14] *Show your ads to the right people with the Facebook pixel*, Facebook, https://www.facebook.com/business/m/pixel-manual-install (last visited on Dec. 19, 2024).

[15] *Business Help Center: About Ad Auctions*, Facebook, https://www.facebook.com/business/help/430291176997542 (last visited on Dec. 19, 2024).

[16] *Id.*

[17] The Terms of Service reproduced in Section B of this Complaint are the Terms of Service that were operative at the time Plaintiff Calise filed his initial complaint against Meta. The Terms of Service that are currently operative are materially similar with only slight variations. *See* **Exhibit A** for a true and correct copy of the Facebook Terms of Service that were operative at the time Plaintiff Calise filed his initial complaint. *See* **Exhibit B** for a true and correct copy of the current Facebook Terms of Service, also available at: *Terms of Service*, Facebook, https://www.facebook.com/legal/terms (last visited Dec. 20, 2024).

***detect misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community. If we learn of content or conduct like this, we will take appropriate action*** - for example, offering help, removing content, removing, or restricting access to certain features, disabling an account, or contacting law enforcement. We share data with other Facebook Companies when we detect misuse or harmful conduct by someone using one of our Products.

Use and develop advanced technologies to provide safe and functional services for everyone:

We use and develop advanced technologies - such as artificial intelligence, machine learning systems, and augmented reality - so that people can use our Products safely regardless of physical ability or geographic location . . . ***And we develop automated systems to improve our ability to detect and remove abusive and dangerous activity that may harm our community and the integrity of our Products***.

33.    Section 3 of the TOS — titled "Your commitments to Facebook and our community" — provides in relevant part:

We provide these services to you and others to help advance our mission. In exchange, we need you to make the following commitments….

**2. What you can share and do on Facebook:**

We want people to use Facebook to express themselves and to share content that is important to them, but not at the expense of the safety and well-being of others or the integrity of our community. You therefore agree not to engage in the conduct described below (or to facilitate or support others in doing so):

1.    You may not use our Products to do or share anything:

- That violates these Terms, our <u>Community Standards</u>, and <u>other terms and policies</u> that apply to your use of Facebook.

- ***That is unlawful, misleading, discriminatory, or fraudulent.***

34.    The Community Standards referenced in Section 3 of the TOS were hyperlinked to a page that provides in relevant part: "Safety: We are committed to making Facebook a safe place."[18] Under "Safety," there is section specifying conduct that is prohibited because it is violent

---

[18] *See* **Exhibit C** for Community Standards that were operative at the time Plaintiff Calise filed his initial complaint against Meta.  The relevant parts of the Community Standards that are currently operative are materially similar with only slight variations. *See* **Exhibit D** for current version, also available at: https://transparency.meta.com/policies/community-standards/?source=https%3A%2F%2Fwww.facebook.com%2Fcommunitystandards (last visited on Dec. 20, 2024).

or criminal, including "5. Fraud and Deception: ***In an effort to prevent fraudulent activity that can harm people or businesses, we remove content that purposefully deceives, willfully misrepresents or otherwise defrauds or exploits others for money or property***. This includes content that seeks to coordinate or promote these activities using our services. We allow people to raise awareness and educate others as well as condemn these activities."[19] The next paragraph in the "Fraud and Deception" section warns users against posting content "Deceiving others to generate a financial or personal benefit to the detriment of a third party or entity through [various scams]."

35.     Section 5 of the TOS — titled "Other terms and policies that may apply to you" — links in the third bullet to Facebook's Advertising Policies, which is described as specifying "the types of content that may appear in Facebook ads." Facebook's Advertising Policies prohibit ads that, *inter alia*: (i) contain deceptive, false, or misleading claims like those relating to the effectiveness or characteristics of a product or service (e.g., false or misleading claims about product attributes, quality, or functionality), and (ii) promote products, services, schemes or offers using deceptive or misleading practices, including those meant to scam people out of money or personal information (e.g., use of a picture of a public figure to mislead users into buying a scam

---

[19] *See* **Exhibit E** for Community Standards, *5. Fraud and Deception*, that was operative at the time Plaintiff Calise filed his initial complaint against Meta. The relevant parts of the Fraud and Deception section of the Community Standards that are currently operative are materially similar with only slight variations. *See* **Exhibit F** for current version, also available at: *Transparency Center: Fraud, Scams, and Deceptive Practices*, FACEBOOK, https://transparency.meta.com/policies/community-standards/fraud-scams (last visited on Dec. 20, 2024).

product).[20] Additionally, Facebook's Advertising Policies prohibited advertisers from using "tactics intended to circumvent our ad review process or other enforcement systems."[21]

**C. How Meta Has Actively Solicited, Encouraged and Assisted Scammers**

36.     In March 2018, Bloomberg News reporter Zeke Faux published an article describing his experiences at an Internet marketing conference in Berlin sponsored by an online forum called Stack That Money (STM).[22] Faux reported that a significant number of the attendees at the conference were affiliate marketers who earned commissions selling shady products such as diet pills by running Facebook ads featuring deceptive pitches like fake celebrity endorsements. Exhibitors at the conference pitched these marketers on campaign ideas such as "You Won an iPhone" and "Your Computer May be Infected," and services such as fake Facebook ad accounts.

37.     While the conference was officially sponsored by STM, Faux wrote that "a newcomer could be forgiven for wondering if it was somehow sponsored by Facebook Inc." As Faux observed, saleswomen from Facebook "held court onstage, introducing speakers and moderating panel discussions," and "[a]fter the show, Facebook representatives flew to [the Spanish isle of] Ibiza on a plane rented by Stack That Money to party with some of the top affiliates."

---

[20] *See* **Exhibit G** for *Advertising Policies*; *Advertising Policies, 23. Misleading Claims*; and *Advertising Policies, 27. Unacceptable Business Practices*. These Advertising Policies were operative at the time Plaintiff Calise filed his initial complaint against Meta. The relevant parts of the Advertising Policies that are currently operative are materially similar with only slight variations.   See **Exhibit H** for current version, also available at:   *Transparency Center: Introduction to the Advertising Standards*, FACEBOOK, https://transparency.meta.com/policies/ad-standards/?source=https%3A%2F%2Fwww.facebook.com%2Fpolicies_center%2Fads (last visited on Dec. 19, 2024).

[21] *See* **Exhibit I** for *Advertising Policies, 28. Circumventing Systems* f that was operative at the time Plaintiff Calise filed his initial complaint against Meta.   The relevant parts of the Circumventing Systems section of the Advertising Policy that is currently operative is materially similar with only slight variations. *See* **Exhibit J** for current version, also available at: *Transparency        Center:        Circumventing        Systems*,        FACEBOOK, https://transparency.meta.com/policies/ad-standards/deceptive-content/circumventing-systems (last visited Dec. 19, 2024).

[22] Zeke Faux, *How Facebook Helps Shady Advertisers Pollute the Internet* , BLOOMBERG (March 27, 2018)   https://www.bloomberg.com/news/features/2018-03-27/ad-scammers-need-suckers-and-facebook-helps-find-them (last visited on Dec. 19, 2024).

38.    Facebook's strong presence at the Berlin conference was no coincidence, as attendees were some of Facebook's best customers who spent millions of dollars a year displaying deceptive Facebook ads. As marketers explained to Faux, Facebook's trove of user data had "revolutionized scamming" by automatically identifying the "suckers" most likely to click deceptive ads for their shady products and services:

> Affiliates once had to guess what kind of person might fall for their unsophisticated cons, targeting ads by age, geography, or interests. Now Facebook does that work for them. The social network tracks who clicks on the ad and who buys the pills, then starts targeting others whom its algorithm thinks are likely to buy. Affiliates describe watching their ad campaigns lose money for a few days as Facebook gathers data through trial and error, then seeing the sales take off exponentially.[23]

39.    As one affiliate selling deceptively priced skin-care creams with fake endorsements from Chelsea Clinton succinctly put it, the Facebook algorithm goes out and "find[s] the morons for me."[24]

40.    When asked by Faux which tools they were using to manage their deceptive advertising campaigns, many marketers identified Voluum, an application developed by a former STM member named Robert Gryn (*see* https://voluum.com/). Gryn's Voluum software was popular with marketers because, among other features, it made it easy for marketers to evade the token digital defenses erected by Facebook to detect scam ads. For example, Voluum enables affiliates to tailor the ads they display by IP address, which identifies the location of the device being used by an individual to access the Internet. This feature allows marketers to "identify the addresses of Facebook's ad reviewers and program campaigns to show them, and only them, harmless content."[25]

41.    Yet, according to Faux — despite the extensive use of Voluum by scammers — Facebook's most senior executive tasked with enforcing its Ad Policies and fighting deceptive ads, Rob Leathern, invited Gryn to visit Meta's London office. This was also no coincidence, because

---

[23] Zeke Faux, *How Facebook Helps Shady Advertisers Pollute the Internet*, BLOOMBERG (March 27, 2018) https://www.bloomberg.com/news/features/2018-03-27/ad-scammers-need-suckers-and-facebook-helps-find-them (last visited on Dec. 19, 2024).
[24] *Id.*
[25] *Id.*

(according to reports that Gryn showed Faux) affiliates using Voluum alone placed $400 million worth of ads a year on Facebook. Notably, while Google banned Voluum, Facebook did not.[26]

42.    While Facebook's salespeople were courting scammers, the Facebook teams charged with combatting deceptive ads were woefully understaffed. According to one Facebook engineer, the platform was more "focused on checking whether ads followed policies about things such as the percentage of text and images," than on "catching people with bad intentions."[27] Indeed, marketers told Faux that getting caught and banned by Facebook for deceptive ads was no big deal — "they just opened a new Facebook account under different names . . . [bought] clean profiles . . . rent[ed] accounts from strangers or cut deals with underhanded advertising agencies to find other solutions."[28]

43.    Moreover, even as Facebook banned certain accounts, its salespeople encouraged the affiliates that opened them to "come to their meetups and parties and . . . buy more ads."[29] As two former Facebook employees who worked in the Toronto sales office told Faux, "*it was common knowledge there that some of their best clients were affiliates who used deception*."[30] These salespeople were instructed to push deceptive marketers "to spend more," with "the rep who handled the **dirtiest accounts** [having] *a quota of tens of millions of dollars per quarter*."[31]

**D. How Meta has Actively Solicited, Encouraged and Assisted Scammers Based in China**

44.    Leathern (Meta's former ad policy enforcement chief) promised Faux that "the party's not going to last," but it has only gotten worse, in particular with respect to advertisers based in China. As detailed below, Facebook's sales teams actively solicit, encourage, and assist advertisers in China — despite knowing that a material percentage of China-based advertisers are running deceptive ads that exploit Facebook users and violate Facebook's ad policies. At the same time, Facebook employees and contractors tasked with monitoring the Facebook platform for ad

---

[26] *See id.* ("Google banned Voluum over cloaking concerns, but that didn't derail the company—Facebook was where the action was.")

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

fraud, have been affirmatively directed to "look the other way" and ignore deceptive ads run by China-based businesses that violate Facebook's Ad Policies (because Meta "wants" China revenue).

45.    Facebook is not generally available in China, yet Meta has still managed to generate billions of dollars a year in ad revenue from China using local affiliates who aggregate ads from local Chinese businesses.

a. **The February 2019 New York Times Investigative Report**

46.    In February 2019, New York Times reporters Paul Mozur and Lin Qiqing explained how a local Chinese partner called Meet Social was operating a 5,000 square foot showroom designed with Meta's guidance in the southern Chinese city of Shenzhen.[32] The showroom — dubbed a Meta "experience center" and opened in the spring of 2018 — is stocked with sales material provided by Meta and hosts prospective clients who wish to advertise on Facebook. Meta employees often visit the experience center to train local businesses on subjects such as how to



A portrait of China's president, Xi Jinping, sits nearby Facebook's experience center. The center is part of a government-run technology exhibition.
Lam Yik Fei for The New York Times

[32] Paul Mozur and Lin Qiqing, *How Facebook's Tiny China Sales Floor Helps Generate Big Ad Money*, THE NEW YORK TIMES (Feb. 7, 2019), https://www.nytimes.com/2019/02/07/technology/facebook-china-internet.html (last visited on Dec. 19, 2024).

create Facebook ads. Videos about Facebook's ad offerings are displayed on screens, and framed examples of Facebook ads by Chinese brands adorn the walls:

47.    The head of Meet Social, Charles Shen, told the Times that his company anticipated doing $1 billion to $2 billion in ad sales on Facebook and Instagram in 2019, and that each day his company places about 20,000 Chinese ads on Facebook. According to the Times investigative report, in addition to Meet Social, there are six other official Meta advertising resellers in China offering similar services to businesses seeking to advertise on Facebook. Without the help of advertising resellers recruited by Meta, Chinese advertisers would be unable to place ads on Facebook because of China's firewall.

**b.    The January 2020 Reuters Investigative Report**

48.    In January 2020, Reuters reported that Meta was setting up a new engineering team in Singapore "to focus on its lucrative China advertising business" by developing localized ad tools.[33] Beyond the engineers, the new office also includes sales staff tasked with growing ad sales from Chinese companies. In November 2019, Meta wrote in Chinese on the popular local social network WeChat (with over a billion active monthly users) that "Facebook is committed to becoming the best marketing platform for Chinese companies going abroad."

49.    According to Pivotal Research Group, Meta's marketing efforts in China have borne fruit, with revenue from Chinese-based advertisers reaching an estimated $5 billion in 2018, or about 10 percent of Meta's total ad sales that year.[34] Assuming the same percentage held in 2022, Meta would have generated $11.3 billion in ad sales from China in 2022.

50.    An internal Facebook ad measurement study, however, found that ***nearly thirty percent (30%)*** of ads placed by Chinese advertising clients violated at least one Facebook ad

---

[33] Paresh Dave and Katie Paul, *FOCUS-Facebook defies China headwinds with new ad sales push*, REUTERS (Jan. 7, 2020), https://www.reuters.com/article/facebook-china-idUSL1N29C0CD (last visited on Dec. 19, 2024).

[34] Paul Mozur and Lin Qiqing, *How Facebook's Tiny China Sales Floor Helps Generate Big Ad Money*, THE NEW YORK TIMES (Feb. 7, 2019), https://www.nytimes.com/2019/02/07/technology/facebook-china-internet.html (last visited on Dec. 19, 2024).

policy, including promoting financial scams, and pitching products that were never delivered.[35] This means that Facebook generated nearly $3.39 billion in revenue from Chinese ads that violated its ad policies in 2022 alone.

**c.    The December 2020 Reuters Investigative Report**

51.    Based on a review of internal Meta documents and messages, and interviews with eight current and former Facebook employees and contractors, a December 10, 2020 Buzzfeed article by Craig Silverman painted a particularly damning portrait of the "financial symbiosis" between Meta and scammers from China who defraud Facebook users with deceptive ads.[36] While Meta feigns protection of its users, Facebook employees told Silverman that, in fact, the Company prioritizes revenue over enforcement of its ad policies. As one individual with direct knowledge of Facebook ads enforcement explained, Meta "is primarily focused on revenue growth, and user safety comes second." Another remarked, Meta "will take any cent that they can get on anything . . . They do not care whatsoever as long as they're making a dime out of it."

52.    Like the deceptive ads described in the March 2018 Bloomberg article, Chinese scam ads use fake celebrity endorsements, as well as pilfered images and videos, to trick Facebook users into putting recurring subscription charges on their credit cards that are difficult to cancel, overpaying for products that never arrive, or falling victim to bait-and-switch schemes in which the product that arrives is not what was advertised and ordered.

53.    For example, in one scam impersonating Stihl, a 94-year-old manufacturer of outdoor tools, Facebook users who clicked a slick video ad to buy one of the company's chainsaws or pruners instead received a single metal chain, an unrelated product, or nothing at all:

---

[35] Craig Silverman and Ryan Mac, *Facebook Gets Paid*, BUZZFEED NEWS (Dec. 10, 2020), https://www.buzzfeednews.com/article/craigsilverman/facebook-ad-scams-revenue-china-tiktok-vietnam (last visited on Dec. 19, 2024).
[36] *Id.*



54.    BuzzFeed's review of roughly a dozen Facebook ads impersonating Stihl products indicated that "half of them, including an ad that attracted close to half a million views, were linked to a Chinese company, Ouyi Electronic Commerce Co., Ltd. of *Shenzhen*" (where, as noted above, Facebook's "experience center" is located). Other fake ads for Stihl products have been linked to a UK shell company called Wofun Ltd., which runs scams on behalf of Hong Kong-based syndicate called Red Haute Trading, Ltd.

55.    Sources inside Facebook who spoke with investigative reporter Silverman, and internal documents reviewed by his team at Buzzfeed, indicate that enforcement of the ad policies purportedly intended to prevent scam ads is extraordinarily lax in part because Meta has outsourced critical ad integrity work to inadequately staffed teams of third-party contractors getting paid low hourly wages and receiving no benefits. Worse, these same sources and documents show that Meta prioritizes its own financial interests over those of its users ***as a matter of policy*** with contractors tasked with monitoring ads often being affirmatively instructed to ignore signs of ad fraud unless an issue may cause Meta to lose money (such as a credit card chargeback):

> Internal messages seen by BuzzFeed News show an Accenture manager who led a team of 45 ads analysts ***instructing contract workers to ignore hacked accounts and other violations as long as "Facebook gets paid" for ads through a valid payment method***. Even if a hacker has taken over a person's account, contractors

were told to allow the hacker to place ads, as long the payment method for ads was valid.

"If they are spending their own money and not adding any foreign cards that don't belong to them, then Facebook doesn't experience any leakage," the manager wrote in July of last year. Leakage refers to credit card chargebacks or other scenarios that result in Facebook having to refund the money.

The Accenture manager justified his guidance to ignore potentially hacked accounts and pages by diminishing the risk involved. He said hackers compromise accounts that control large pages because they're "interested in the broad reach these larger pages have and simply want to reach larger audiences with legitimate ads."

***He framed it as a win-win scenario for Facebook and people exploiting its advertising system because Facebook earns revenue and the hacker can reach more people with their ad.*** "Facebook gets paid, the bad actors get to run their ads to a larger market," the manager wrote. ***He joined Facebook as a full-time risk investigations analyst in April of this year, according to his Facebook profile***.[37]

56.    After learning of the directives described above, Laura Edelson, a researcher with NYU's Online Political Ads Transparency Project, concluded that the job of these Facebook contractors is plainly to protect *Meta* — and *not* its users — from fraud. Tim Hwang, author of the book on ad fraud, further observed that, based on the sources above, Facebook has subjected these contractors to untenable conflicts of interest where they have to think about the impact of their enforcement actions on revenue, instead of focusing solely on risk. As for the question of revenue versus risk, Hwang noted, "[i]t's clear through their policy which one Facebook is prioritizing."[38]

57.    Lax enforcement is particularly acute as applied to China-based advertisers because of the vast amount of revenue generated by China-based ads. As one source with knowledge of Facebook's ad enforcement advised Silverman, deception by China-based advertisers is well known among Facebook's employees and contractors. The source indicated that "[w]e're not told in the exact words, ***but [the idea is to] look the other way***. It's 'Oh, that's just China being China.' It is what it is. ***We want China revenue***." For this reason, the source added, "I would never buy anything on Facebook."[39] Further internal Facebook documents reviewed by Buzzfeed revealed

---

[37] Craig Silverman and Ryan Mac, *Facebook Gets Paid,* BUZZFEED NEWS (Dec. 10, 2020), https://www.buzzfeednews.com/article/craigsilverman/facebook-ad-scams-revenue-china-tiktok-vietnam (last visited on Dec. 19, 2024).
[38] *Id.*
[39] *Id.*

that "Facebook has been aware of an epidemic of violative ads and scammers operating out of China *for years*."

58.    According to a former Facebook employee, even when Facebook bans Chinese advertisers for violating policies, they simply "return to the platform by setting up new companies and creating new Facebook ads accounts."[40] That tactic was used by a Hong Kong-registered advertiser, ZestAds, that was purportedly banned by Facebook, yet still purchased and placed misleading ads selling face masks after the onset of the COVID-19 pandemic.

### d.    The December 2020 *Time* Investigative Report

59.    The findings above in the December 2020 *BuzzFeed* article were corroborated a week later in a December 18, 2020 *Time* expose, which featured a recent scam in which ads originating from China and Hong Kong-based companies infringed copyrighted sea glass sculptures produced by a small business in Florida — and even misappropriated the likeness of the sculptor — to trick Facebook users into making purchases. But instead of receiving the sculptures, buyers received plastic cones or tiny wooden gnomes:[41]



Kristi Pimentel, left, had photos of her and her sea glass trees stolen and put onto scam advertisements on Facebook, left and center; Heather Hopper purchased three and says she instead was sent a gnome, right.    Gnome: Courtesy of Heather Hopper

---

[40] *Id.*

[41] Andrew R. Chow, *Here's How Shopping Scams on Facebook Are Ripping Off Thousands of Customers, With the Money Flowing Overseas*, TIME (Dec. 18, 2020), https://time.com/5921820/facebook-shopping-scams-holidays-covid-19/ (last visited on Dec. 19, 2024). The two URL's depicted in the scam ads in the screenshots in the text are: Sell22Ty.com and https://bit.ly/3dngAoU (which redirected to the wallien.store domain as of February 3, 2021). According to the WHOIS database that tracks domain name registrations, the former domain was

60.     The Time article traced other Facebook ad scams to China-based advertisers. For instance, one Facebook scam ad led to a website called Apriloina.com, which was registered by a China-based company. That site shared the same IP addresses, customer support emails, phone numbers, and warehouse shipping addresses in Mainland China as thousands of other e-commerce websites.

61.     As another example, Time uncovered public links between one Facebook ad scam network and two large Chinese companies: publicly-traded TIZA Information Industry Corporation Inc. (which provides industrial Internet IT services), and TIZA's subsidiary Youkeshu, an e-commerce company. According to public records reviewed by Time, Youkeshu is the biggest shareholder of both Shenzhen Guiguyun software technology co., LTD—which owns the domain Kokoerp.com, where many of the scam sites appear—and Duo Tongguang Electronic Commerce Co., Ltd, a shell company that has been the subject of hundreds of complaints on PayPal and other sites. Email addresses and internal portals link the Youkeshu and Kokoerp domains together. And some "Kokoerp" scam victims have reported receiving boxes with YKS — Youkeshu's trading symbol — on the return label.

**E.  FTC Data Shows That the Volume of Scam Ads on Social Media Sites Like Facebook is Growing Rapidly**

62.     Data collected by the FTC concerning social media fraud confirms that the volume of scam ads on social media sites like Facebook is growing rapidly. On October 21, 2020, the FTC issued a press release announcing that consumers reported losing more than $117 million on social media scams in just the first six months of 2020, as compared to $134 million for all of 2019. The latest FTC data indicates that consumer losses from social media scams totaled $131 million in the first quarter of 2021 alone — nearly the same number as the entire 2019.

63.     Critically, these numbers only represent the losses reported to the FTC and other law enforcement entities (primarily in the United States) that contribute data to the FTC's Consumer Sentinel Network. It does not account for consumers who did not report their losses to

registered by a company in Hong Kong, and the latter domain was registered by a company in China.

enforcement authorities, which means total losses to U.S. consumers from social media scams exceeds what has been reported by the FTC.

64.    The FTC's October 2020 press release also reported that "online shopping" fraud topped the list of complaints concerning social media fraud that consumers submitted to the FTC. Many of these consumers reported that they had attempted to purchase a product promoted in a social media ad, but then the item they ordered never arrived. Approximately 94% of these consumers identified Facebook or its Instagram site as the platform on which the deceptive ad appeared.

**F. Meta Has No Incentive to Crack Down on Scam Ads**

65.    Meta clearly had the investigative, financial, and technical resources to effectively crack down on the volume of scam ads appearing on its website. As one example that Meta is ready, willing, and able to marshal its resources when threatened, when hedge fund titan George Soros criticized Meta at a global economic forum, Meta's COO, Sheryl Sandberg, promptly ordered an investigation to determine if Soros was selling Facebook stock short.[42]

66.    But with respect to scam ads, Meta has no incentive to deploy its resources to crack down because it is generating billions of dollars a year in ad sales from scam ads. As the Buzzfeed article reported, "according to current and former employees, as well as industry experts . . . ***Facebook typically keeps the money it earns from scam ads and fraudulent campaigns that pollute its platforms, unless it involves credit card fraud***."[43] For example, Meta "earned more than $50 million in revenue over two years from a single San Diego marketing agency that ripped off Facebook users by tricking them into hard-to-cancel subscriptions and investment scams, and it banked almost $10 million in advertising revenue from the Epoch Times, a pro-Trump media

---

[42] Nicholas Confessore and Matthew Rosenberg *Sheryl Sandberg Asked for Soros Research, Facebook Acknowledges*, THE NEW YORK TIMES (Nov. 29, 2018), https://www.nytimes.com/2018/11/29/technology/george-soros-facebook-sheryl-sandberg.html (last visited on Dec. 19, 2024).
[43] Craig Silverman and Ryan Mac, *Facebook Gets Paid*, BUZZFEED NEWS (Dec. 10, 2020), https://www.buzzfeednews.com/article/craigsilverman/facebook-ad-scams-revenue-china-tiktok-vietnam (last visited on Dec. 19, 2024).

organization that spreads conspiracies, before banning the outlet's ads for using fake accounts and other deceptive tactics."[44]

67.     These and other examples cited by investigative journalists illustrate that Meta's corporate culture prioritizes its own revenue growth over the safety of its users, a reality further corroborated by other publicly disclosed tradeoffs the Company has made. For example, in November 2020, the New York Times reported that engineers and data scientists had developed an algorithm to predict whether posts by individual users were "bad for the world" (*e.g.,* spread misinformation), and demote those posts in news feeds to reduce the spread of objectionable content.[45] The algorithm "successfully reduced the visibility of objectionable content," but since objectionable posts tend to be shared more broadly, the algorithm's demotion of such posts decreased user sessions (a metric measuring time spent on Facebook). Fewer sessions meant fewer eyeballs and hence fewer ad dollars (as a former Facebook data scientist explained),[46] and therefore the team tweaked the algorithm to reduce the strength of the demotion. That tweak "left more objectionable posts in users' feeds," but "did not reduce their sessions or time spent."[47] Only then did executives approve the algorithm. As with deceptive ads, revenue trumped user safety.

---

[44] *Id; see also* Facebook's Purchase Protection program only refunds money for purchases checked out through the Facebook website; purchases made through third-party sites, do not qualify for Purchase Protection. *See* Using Facebook, *How Purchase Protection works on Facebook*, FACEBOOK, https://www.facebook.com/help/228307904608701 (last visited on Dec. 19, 2024).
[45] Kevin Roose, Mike Isaac and Sheera Frenkel, *Facebook Struggles to Balance Civility and Growth*, THE NEW YORK TIMES (Nov. 24, 2020), https://www.nytimes.com/2020/11/24/technology/facebook-election-misinformation.html (last visited on Dec. 19, 2024).
[46] Roddy Lindsay, *Facebook Has a Recipe For Better Social Media. Why Isn't The Company Using It?*, THE INFORMATION (Nov. 27, 2020), https://www.theinformation.com/articles/facebook-has-a-recipe-for-better-social-media-why-isnt-the-company-using-it (last visited on Dec. 19, 2024).
[47] Kevin Roose, Mike Isaac and Sheera Frenkel, *Facebook Struggles to Balance Civility and Growth*, THE NEW YORK TIMES (Nov. 24, 2020), https://www.nytimes.com/2020/11/24/technology/facebook-election-misinformation.html (last visited on Dec. 19, 2024).

68.    A similar narrative has emerged from unsealed documents in a class action by advertisers against Meta alleging that its "Potential Reach"[48] metric was inflated and misleading. (*DZ Reserve and Cain Maxwell v. Facebook, Inc.*, Civ. No. 3:18-cv-04978-JD (N.D. Cal.)). Internal documents referenced in plaintiffs' recently unredacted opposition to dismiss (Dkt. 257) reinforce that Meta prioritizes revenue growth over integrity:

> The Potential Reach Product Manager (Yaron Fidler) proposed a fix that would have decreased the Potential Reach numbers. *Id*. ¶¶ 80-81. But Facebook's metrics leadership team rejected his proposal ***because the "revenue impact" for Facebook would be "significant."*** *Id*. ¶¶ 80-82, 84. Fidler responded, "it's revenue we should have never made given the fact it's based on wrong data." *Id*. ¶ 82. ***Fidler's proposals to fix the flawed metric were repeatedly rejected. Id. ¶ 91.***

69.    Facebook users are continually aggravated by their attempts to use Facebook's tools to remove scam ads, as they are stymied by Facebook's review processes and enforcement,[49] as depicted below:



---

[48] Potential Reach is an estimation of how many people an ad can potentially reach depending on the targeting and ad placement. *See Meta Business Help Center: About Estimated Audience Size, https://www.facebook.com/business/help/1665333080167380?id=176276233019487* (last visited on Dec. 19, 2024).

[49] *See Reporting blatant scam ads, but the ads are not being removed and are found to not break Facebook rules,* REDDIT (r/facebook) https://www.reddit.com/r/facebook/comments/1dgibpz/reporting_blatant_scam_ads_but_the_ads_are_not/ (last visited Dec. 19, 2024).

70.     In fact, there are groups on Facebook devoted to users lamenting about being scammed by deceptive ads on Facebook:



71.     As one Facebook user warns, "Everyone learns the hard way.  Don't order anything frm a Facebook ad!! Ever!"

72.     In sum, because Meta prioritizes revenue growth over the safety of its users as a matter of corporate policy, Facebook users continue to be bilked out of billions of dollars by scammers while Meta continues to collect billions of dollars in revenues from those same scammers. Instead of employing its vast investigative, technical, and financial resources to vigorously crack down on scammers, Meta is incentivized to continue investing money in "experience centers" and sales offices in China where Facebook knows a material percentage of advertisers are violating its Ad Policies. As author Tim Hwang observed to Buzzfeed, "*I think the profit motive definitely makes it harder for Facebook to take real steps here*."

## PLAINTIFFS' EXPERIENCES

### Christopher Calise

73.     On or about September 11, 2020, Mr. Calise saw a Facebook ad for a car engine assembly kit.  The ad was designed to appear legitimate, and thus Mr. Calise had no reason to believe it was a deceptive or misleading ad.

74.     Mr. Calise clicked the ad, which linked to a website with the domain miuxo.com.



After

1   reviewing the website, Mr. Calise purchased the car engine assembly kit for $48.97 using his debit

2   card.

3        75.    On October 4, 2020, Mr. Calise emailed service@miuxo.com requesting tracking

4   information for his order.  After not receiving any response, on October 15, 2020, Mr. Calise

5   emailed again inquiring about a delivery date.  Mr. Calise never heard back from the company and

6   the car engine assembly kit was never delivered.

7        76.    Mr. Calise did not receive a refund of the purchase price he paid.

8        77.    In November 2020, Mr. Calise reported Miuxo's ad to Facebook. Facebook agreed

9   that the ad violated its Ad Policies and claimed to have removed it. Yet, according to Facebook's

10  online ad library, Miuxo was able to launch a new Facebook ad promoting another engine assembly

11  kit in December 2020 under the name Miuxo-shop, which scammed additional Facebook users:

12

13

14

15

16  

17

18

19

20

21

22

23

24

25

26

27

28

78.    The following screenshots depict just three examples of additional Facebook users scammed by Miuxo after Facebook claimed to have removed the ad: [50]



**Christopher Officer** doesn't recommend **Miuxo-shop.**
January 1 ·

fake company. will not respond to emails or issue refund. I ordered back in Nov, still haven't received an order confirmation or product.

👍 Like          💬 Comment          ↪ Share

**Simon Harrison** doesn't recommend **Miuxo-shop.**
November 23, 2020 ·

Total scam, from all the comments I cant see 1 single customer who received their items

😡 1                                         1 Comment

👍 Like          💬 Comment          ↪ Share

**Brad Hughes**
THIEVES! Do NOT purchase anything! Keeps your money, no products. No refund!😡😡
Reported to Facebook!😡

Like · Reply · 30w

**Owen Ridley** doesn't recommend **Miuxo-shop.**
December 8, 2020 ·

Total scam. never received purchase nor could I get them to reply to emails

👍 Like          💬 Comment          ↪ Share

---

[50]    Previously available at: https://www.facebook.com/Miuxo-shop-112359277218742/reviews/?ref=page_internal (last visited on July 2, 2021). The Miuxo Facebook page has since been taken down by Facebook.

79. Upon information and belief, the ad seen by Mr. Calise was placed by a Hong Kong-based scammer.

80. Mr. Calise continues to regularly use Facebook and see Facebook ads, and is, therefore, vulnerable to future scams.

81. As a result of the processes, practices, and policies at Meta that are facilitating, and encouraging the display of deceptive and misleading ads on Facebook's website, Mr. Calise was harmed because he spent money on a product that he would not have otherwise purchased had he known he was being defrauded.

82. Prior to filing suit against Meta, on behalf of himself and the proposed classes, Mr. Calise made a reasonable attempt to settle the claims alleged herein short of litigation, by delivering a presuit demand to Meta on June 1, 2021 through counsel, notifying Meta of his grievances and proposed remedies. That settlement attempt was ultimately unsuccessful because Meta refused to provide Mr. Calise with all of the internal documents he needed to reasonably investigate the claims alleged herein and implement appropriate remedies.

1   **Terri Bohl**

2       83.    Ms. Bohl's experience is all too typical of those experienced by members of the

3   Classes with Deceptive Facebook Ad

4       84.    On or about August 23, 2021, Ms. Bohl saw an ad for an officially licensed

5   Nightmare Before Christmas 21-inch-tall cuckoo clock. The ad was designed to appear legitimate,

6   and thus Ms. Bohl had no reason to believe it was actually promoting a fraudulent "bait-and-

7   switch" scheme.





⭐ HALLOWEEN PREE SALE 50% OFF ⭐

Buy 2 FREE first 100 orders

95% of Customers buy 2 –3 Pcs for friends and family

Description：
A unique and officially licensed Disney Tim Burton handcrafted sculptural cuckoo clock features Jack Skellington, Sally, LED lighting, movie music, Zero popping out on the hour and more
Exclusively – you won't find this edition anywhere else!

Officially licensed by Disney
Disney Tim Burton's The Nightmare Before Christmas Cuckoo Clock

Lights, music and motion bring your spookiest friends to life! On the hour, the music to "This is Halloween" plays and Zero emerges as a-one-of-a-kind cuckoo!

2/5



**Key Features:**

**Color:As Shown in Picture**
**Material:Wood**
**Item Dimensions LxWxH:21 x 9 x 14 inches**
**Shape:House**
**Item Weight:6.74 Pounds**
**Are Batteries Included:No**
**Mounting Type:Wall Mount**

Time seemingly stands still as you gaze upon this compelling cuckoo clock; watch as Jack Skellington and Sally meet upon the steps in front of the Town Hall, gaze into the illuminated windows of Jack's Tower, and marvel at the mix of pumpkins, ghosts, black cats and Halloween banners that adorn this amazingly intricate timepiece! You should also keep an eye out for Lock, Shock and Barrel hanging around the pinecone weights which hang from the bottom of this Nightmare Cuckoo Clock. In between these pinecone weights hangs a magnificent brass-toned pendulum which has been embellished with the design of Halloween Town's iconic Spiral Hill.

3/5

85.     After reviewing the website, Ms. Bohl purchased the Nightmare Before Christmas Clock for $36.99, plus $4.99 shipping, using her PayPal account, totaling $41.98. The PayPal transaction confirmation displayed the product Ms. Bohl had seen on the website:



86.     But when her package arrived, it did not contain the clock she had ordered, but a cheap facsimile of the clock – the clock was 7 inches tall rather than 21 inches, and appears unfinished:



87.     Ms. Bohl wrote to the vendor, who offered a $5 refund.

88.     Ms. Bohl found this solution inadequate and escalated the issue with PayPal.

89.     Through PayPal, the vendor provided an address in China and directed Ms. Bohl to ship the item to an address in China for a full refund.

90.     However, the shipping cost to return the product to the China-based address required Ms. Bohl to pay $80 out of pocket to receive the refund.

91.     While PayPal offered to pay $30 of the shipping cost, this still left Ms. Bohl out of the pocket for the remainder.

92.     Ms. Bohl subsequently filed a report to the FTC.

93.     Ms. Bohl continues to regularly use Facebook and sees Facebook ads, and is, therefore, vulnerable to future scams.

94.     As a result of the processes, practices, and policies at Meta that are facilitating and encouraging the display of deceptive and misleading ads on Facebook, Ms. Bohl was harmed because she spent money on a product that she would not have otherwise purchased had she known she was being defrauded.

**Noah Faerber**

95.     In or around January 2024, Mr. Faerber saw a marketplace ad for a car trade, where the owners essentially swap cars with one another.

96.     Mr. Faerber responded to the marketplace ad (which has since been removed).

97.     Mr. Faerber agreed to trade his Mazda Miata for the marketplace poster's ("Kyle") Toyota MR2.  Mr. Faerber and Kyle exchanged papers and keys on or about January 9, 2024.

98.     After the exchange, in fact the night of the exchange, Kyle used copies of the car keys to steal the exchanged-for car, and registered both vehicles in his name thereafter.

99.     Mr. Faerber became aware that Kyle stole his car because Kyle subsequently posted about the event on Facebook, and Kyle even messaged Mr. Faerber boasting about his theft.

100.     Mr. Faerber reported Kyle's theft to the police and Facebook.

101.     Mr. Faerber has since learned that Kyle has preyed on victims of this exchange-and-steal scheme through Facebook on a number of occasions and that Facebook was made aware

1   of Kyle's illegal activity, but upon information and belief did nothing to stop him or otherwise

2   warn those dealing with him.

3                          **ANOTHER CONSUMER'S EXPERIENCE**

4   **Anastasia Groschen[51]**

5       102.    On or about November 24, 2020, Ms. Groschen saw a Facebook ad for an activity

6   board that she thought would be appropriate for her toddler. The ad was designed to appear

7   legitimate, and thus Ms. Groschen had no reason to believe it was actually promoting a fraudulent

8   "bait-and-switch" scheme. The ad is no longer available in Facebook's online ad library.



---

27   [51] Ms. Groschen was a Plaintiff in the initial action, filed on August 11, 2021.  Ms. Groschen has
28   passed away and her claims will no longer be pursued in this action.  *See* Suggestion of Death,
     Dkt. No. 55.

1

103.   Ms. Groschen clicked the ad, which linked to a website with the domain

2

"kidspunza.com." Ms. Groschen saw the following activity board on the "kidspunza.com" website

3

being sold for $24.98:

4

104.   After reviewing the website, Ms. Groschen purchased the activity board for $24.98,

5

plus $5.99 shipping, using her PayPal account. The purchase confirmation displayed the product

6

Ms. Groschen had seen on the website:

7

8



9

10

11

12

13

14

15

16

17

18

19

20

21

22

105.   On November 27, 2020, Ms. Groschen received an email notification that the

23

product she ordered had been shipped:

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



25   106.   But when a package arrived on December 24, 2020, it did not contain the activity

26   board she had ordered, but a cheap wooden "ABC" puzzle:

27
28



107.    On December 24, 2020, Ms. Groschen wrote to the vendor through her PayPal account:

> I received a package with this tracking number today, however it is not what I ordered. I ordered a toddler busy board 60x80 cm [23.6 inches x 31.5 inches] with [a] variety of activities. The package contained a small wooden puzzle 8.5" x 11" size. They sell these in Dollar store. What a terrible service. I need my payment refunded please.

108.    Through PayPal, the vendor provided an address in China, and directed Ms. Groschen to take the item to the post office, ship it back to the address in China, and provide them with a tracking number. PayPal has since deleted this message from the case history.

109.    On January 11, 2021, Ms. Groschen responded that "I need you to send me a pre-paid shipping label. I am not going to pay to send this back to China since it's not my fault you sent me the wrong item."

110.    On January 20, 2021, Ms. Groschen again asked for a prepaid shipping label on the ground that the company had sent her the wrong item and should pay to ship it back to China.

111.    Ms. Groschen declined to ship the item back to China at her own expense because she knew she was dealing with a scammer (indeed, another Facebook user who shipped a product back to China, reported that the seller claimed it never received the return, and refused to issue a credit, even though the buyer had a post office receipt). As a result, PayPal resolved Ms. Groschen's case in the seller's favor on January 29, 2021, and refused to issue any refund to Ms. Groschen.

112.    While the kidspunza.com website was still functioning as of February 10, 2021, the item that Ms. Groschen saw on the website after clicking the Facebook ad no longer appeared on the website at that time. But Ms. Groschen is not the only Facebook user damaged by Kidspunza's bait-and-switch scheme, as evidenced by the numerous other complaints about the *identical* scam published to Kidspunza's Facebook page.[52] The following screenshots depict just two examples:

---

[52]    Previously available at: https://www.facebook.com/pg/Kidspunza-103657824859663/reviews/?ref=page_internal (last visited on February 12, 2021). The Kidspunza Facebook page has since been taken down by Facebook.

113.    According to the WHOIS database, the kidspunza.com domain was registered by an organization in China on June 3, 2020.

114.    Additionally, as of February 10, 2021, the "kidspunza.com" Contact Us page identified the website owner as a Chinese company (Shanghai HongMian Trading Co., Ltd.) with a mailing address in China:



115.    As a result of the processes, practices, and policies at Meta that are facilitating and encouraging the display of deceptive and misleading ads on Facebook, Ms. Groschen was harmed because she spent money on a product that she would not have otherwise purchased had she known she was being defrauded.

## CLASS ALLEGATIONS

116.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) on behalf of the following proposed Class and Subclass (collectively referred to hereinafter as the "Classes"):

**Injunctive Relief Class ("Class")**

All individuals with an active Facebook account.

**Damages Subclass ("Subclass")**

All individuals with an active Facebook account who, between August 11, 2017, through the present, clicked on a Deceptive Facebook Ad and suffered harm.

117.    Specifically excluded from the Classes are Meta, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Meta, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Meta and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

118.    Plaintiffs reserve the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveals that such definitions should be expanded, narrowed, divided into further subclasses, or otherwise modified in any way.

119.    The Classes satisfy the requirements of Federal Rules 23(a): numerosity, commonality, typicality, and adequacy.

120.    *Numerosity.* The members of the Classes are so numerous that joinder of all members is impracticable.  While the precise number of the members in each of the Classes is presently unknown, Meta latest Form 10-K indicates that there are approximately 203 million daily active Facebook users in the United States and Canada. Further, internal Facebook records referenced above indicate that Facebook generates billions of dollars a year in revenue from ads purchased by China-based companies, and that 30% of these ads violate one or more of Facebook's ad policies. This means that, conservatively, millions of Facebook users in the United States are regularly exposed to Facebook ads that are deceptive.

121.    ***Existence of common questions of law and fact.***  Common questions of law and fact exist as to all members of the Classes.  The common factual and legal questions include, but are not limited to, the following:

(a)    Whether Meta actively solicits, encourages, and assists scammers whom it knows or should know are placing deceptive ads on Facebook;

(b)    Whether Meta owes legal duties to Classes, and breached and continues to breach those duties;

(c)    Whether Meta breached and continues to breach the Facebook Terms of Service with members of the Classes;

(d)    Whether Meta breached and continues to breach its covenant of good faith and fair dealing with members of the Classes;

(e)    Whether Meta breached and continues to breach its duty to warn members of the Classes of the danger of fraudulent advertising on Facebook;

(f)    Whether Meta's misconduct alleged herein caused and continues to cause harm to members of the Classes;

(g)    Whether Meta has the capability to implement changes to processes, practices, and policies to vet new advertisers before permitting them to display ads;

(h)    Whether Meta has the capability to implement changes to processes, practices, and policies to prevent repeat offenders from circumventing enforcement mechanisms to continue displaying scam ads;

(i)    Whether Meta has the capability to implement changes to processes, practices, and policies to more adequately process and respond to reports of scam ads submitted by Facebook users;

(j)    Whether Meta has the capability to implement changes to processes, practices, and policies to more adequately identify and remove ads that violate Facebook's ad policies;

(k)     Whether Meta has the capability to implement changes to processes, practices, and policies to educate users about the location and use of tools available to protect themselves against scam ads;

(l)     Whether Meta has the capability to compensate Facebook employees and contractors tasked with monitoring Facebook's websites for scam ads to ensure, among other things, that such employees and contractors are incentivized to prioritize protection of Facebook users from deceptive ads;

(m)    Whether Class members are entitled to injunctive and declaratory relief, including without limitation, the Proposed Injunctive Relief to prevent future harm; and

(n)     Whether Subclass members are entitled to damages and/or disgorgement of unjustly earned profits as a result of Facebook's misconduct.

122.    **Typicality.**  Plaintiffs' claims are typical of the claims of the other members of the Classes in that the claims of Plaintiffs and other members of the Classes are reasonably co-extensive, and arise from the same course of wrongful conduct by Meta.

123.    **Adequacy of representation.**  Plaintiffs will fairly and adequately protect the interests of the members of the Classes.  Plaintiffs have retained counsel highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action.  Further, Plaintiffs have no interests that are antagonistic to those of the other members of the Classes.

124.    The Class satisfies the requirements of Rule 23(b)(2) because Meta has acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and injunctive relief with respect to Class members as a whole.

125.    The Subclass also satisfies the requirements of Federal Rules 23(b)(3): predominance and superiority.

126.    **Predominance.** The common issues identified above will predominate over any questions affecting only individual Subclass members. In particular, Meta's liability will be determined by reference to the Terms of Service, as well as other common evidence in the form of

Meta's internal records, including internal studies (such as referenced in paragraph 49 above), financial records, and databases storing information concerning the display of every ad to every user, including the date of display, the identity of the user, the identity of the advertiser, and the amount paid by the advertiser to Meta for the ad.[53]

127.    ***Superiority.***  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Subclass members is relatively small compared to the burden and expense that would be involved in individual litigation of their claims against Facebook.  It would, thus, be virtually impossible for the Subclass members, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single United States District Court, and presents no unusual management difficulties under the circumstances presented in this case.

128.    Alternatively, at a minimum, particular common issues are appropriate for class treatment under Rule 23(c)(4).

---

[53] See **Exhibit K** for a screenshot of an archived version of *How advertisers' audience selections appear in "Why am I seeing this ad?"*, Facebook, https://www.facebook.com/business/m/why-am-i-seeing-this-ad; *Ad Library*, Facebook, https://www.facebook.com/ads/library/ (last visited Dec. 19, 2024); *DZ Reserve, et al. v. Facebook, Inc.*, 18-cv-04978-JD (N.D. Cal.), Dkt No. 227 at Sec. II at 2-3.

**CAUSES OF ACTION**

**COUNT I**

**Breach of Contract**

129.    Plaintiffs Calise and Bohl reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

130.    Plaintiffs and other members of the Classes entered into a services contract with Meta consisting of Facebook's TOS, which incorporated by reference the Community Standards, and the Advertising Policies.

131.    The TOS contains enforceable promises that Facebook made to the Plaintiffs and other members of the Classes, including but not limited to, as set forth below.

132.    In Section 1 of the TOS, Facebook states that (i) "[p]eople will only build community on Facebook if they feel safe," and promises that (ii) "[w]e employ dedicated teams around the world and develop advanced technical systems to ***detect misuse of our Products***, ***harmful conduct towards others***, and situations where we may be able to help support or protect our community." Facebook further promises that "[i]f we learn of content or conduct like this, ***we will take appropriate action*** - for example, offering help, removing content, removing or restricting access to certain features, ***disabling an account***, or contacting law enforcement." Facebook materially breached these promises by actively and affirmatively soliciting, encouraging, and assisting Deceptive Facebook Advertisers it knew or should have known were defrauding Facebook users, including without limitation, by taking the following actions:

(a)    Actively undertaking various marketing efforts (including conferences, tradeshows, meetups, and parties) to encourage advertisers that it knew were displaying, or had displayed Deceptive Facebook Ads that violated Facebook's Ad Policies to "buy more" Facebook ads and "spend more" on Facebook ads;

(b)    Actively soliciting and training advertisers in China despite knowing for years that a material percentage of the Facebook ads placed by China-based companies violate one or more of Facebook's Ad Policies;

(c)    Affirmatively directing employees and contractors monitoring Facebook's platform for Deceptive Facebook Ads to ignore violations of Facebook's Ad Policies, as long as Facebook gets paid for those ads;

(d)    Affirmatively directing employees and contractors monitoring Facebook's platform for Deceptive Facebook Ads to ignore ads placed by hacked Facebook accounts and pages, as long as Facebook gets paid for those ads;

(e)    Affirmatively directing employees and contractors monitoring Facebook's platform for Deceptive Facebook Ads to "look the other way" and refrain from enforcing Facebook's Ad Policies against Deceptive Facebook Ads placed by China-based companies (since Facebook "want[s] China revenue"); and

(f)    Affirmatively enabling Deceptive Facebook Advertisers whose accounts were banned to quickly resume placing Deceptive Facebook Ads through lax enforcement of Facebook's ad policies.

133.    In Section 1 of the TOS, Facebook further promises that "we develop automated systems to improve our ability **to detect and remove abusive and dangerous activity that may harm our community and the integrity of our Products**." Meta materially breached this promise by actively and affirmatively soliciting, encouraging, and assisting Deceptive Facebook Advertisers it knew or should have known were defrauding Facebook users, including without limitation, by taking the actions detailed in paragraph 132(a)-(f) above.

134.    The Community Standards incorporated by reference in Section 3 of the TOS provide in relevant part "[w]e are committed to making Facebook a safe place," and in the "Safety" section Facebook promises "Fraud and Deception: In an effort to prevent fraudulent activity that can harm people or businesses, **we remove content that purposefully deceives, willfully misrepresents or otherwise defrauds or exploits others for money or property**." Meta materially breached this promise by actively and affirmatively soliciting, encouraging, and assisting Deceptive Facebook Advertisers it knew or should have known were defrauding Facebook users, including without limitation, by taking the actions detailed in paragraph 132(a)-(f) above.

135.    Plaintiffs performed all, or substantially all, of their material obligations under the TOS.

136.    As a direct and proximate result of Meta's material breaches of the TOS as described above, members of the Classes suffered damages and Facebook unjustly profited. To redress such harm, Plaintiffs seek the relief set forth below on behalf of themselves and other members of the Classes.

## COUNT II

### Breach of the Covenant of Good Faith and Fair Dealing

137.    Plaintiffs Calise and Bohl re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

138.    In every contract there is an implied promise of good faith and fair dealing.

139.    Plaintiffs Calise, Bohl and other members of the Classes entered into a services contract with Facebook consisting of the TOS, which incorporated by reference the Community Standards, and the Advertising Policies.

140.    The TOS contains enforceable promises that Meta made to the Plaintiffs and other members of the Classes, including without limitation, the promises set forth in paragraphs 132-134 above.

141.    By actively and affirmatively soliciting, encouraging, and assisting Deceptive Facebook Advertisers it knew or should have known were defrauding Facebook users — including without limitation, by taking the actions detailed in paragraph 132(a)-(f) above — Meta engaged in conduct that frustrated and interfered with the rights of Plaintiffs and other members of the Classes to the benefits of the TOS (including without limitation, the right to a safe environment while using Facebook and right to be protected against being scammed by deceptive ads).

142.    Plaintiffs Calise and Bohl performed all, or substantially all, of their material obligations under the TOS.

143.    As a direct and proximate result of Meta's breach of the covenant of good faith and fair dealing, members of the Classes suffered damages and Meta unjustly profited. To redress such

harm, Plaintiffs Calise and Bohl seek the relief set forth below on behalf of themselves and other members of the Classes.

## COUNT III

### Negligent Failure to Warn

144.    Plaintiffs Calise, Bohl, and Faerber re-allege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

145.    At all relevant times, Meta designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefits from its products, including Facebook, being used by Plaintiffs and members of the Classes.

146.    Plaintiffs and members of the Classes were foreseeable users of Meta's products, including without limitation, Facebook.

147.    Meta knew, or by the exercise of reasonable care, should have known, that use of its products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner.

148.    For example, Meta had actual knowledge that a substantial portion—nearly 30 percent—of the ads placed on the Facebook platform by China-based advertisers violated at least one of Facebook's own Ad Policy.

149.    No later than December 10, 2020, Meta had the requisite knowledge to avoid future harm to Meta's users by third parties posting, disseminating, sharing, and targeting Deceptive Facebook Ads at them, including without limitation, the Deceptive Facebook Ads posted, disseminated, shared, and targeted by China-based advertising.

150.    Based on this knowledge, Meta knew or by the exercise of reasonable care, should have known that Facebook was dangerous when used to view advertisements and purchase products and services.

151.    Meta knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs and members of the Classes would not have realized the potential harms, risks, and dangers of Meta's products including, without limitation, the risk of third party advertisers posting, disseminating, sharing, and targeting Deceptive Facebook Ads for fraudulent

websites in furtherance of efforts to lure Meta's users into, among other schemes, bait-and-switch scams where high-quality products are advertised, but cheap, low-quality items are shipped, and non-delivery scams, where the seller takes payment for products that never arrive.

152.    Meta knew, or by the exercise of reasonable care, should have known that its products posed risks to its users. These risks were known and knowable in light of Meta's own internal data and knowledge regarding its products and advertises at the time of the development, design, marketing, promotion, advertising, and distribution to Plaintiffs and members of the Classes.

153.    Meta owed a duty to all reasonably foreseeable users to provide adequate warnings about the risk of using Meta's products that were known to Meta, or that Meta should have known through the exercise of reasonable care.

154.    Meta had a duty to make adequate disclosures and warn its users of the danger presented and inform them of the need to screen and verify the legitimacy of advertising posted on the Facebook platform.

155.    Meta knew that Plaintiffs and members of the Classes, by using the Facebook platform, were exposed to an unreasonable risk of harm from the foreseeable risk of fraudulent advertising placed on the platform.

156.    Meta knew or should have reasonably known based on Facebook users' complaints to the platform that Facebook users did not realize the danger of Deceptive Facebook Ads on the platform before they were victimized.

157.    Meta had superior knowledge of the fraudulent advertising being placed on the Facebook platform.

158.    Meta controlled the Facebook platform and had the means and ability to warn Facebook users of a known harm.

159.    Meta had a duty to disclose to, or warn Plaintiffs and members of the Classes, of the dangers that were known to Meta from advertisers placing fraudulent advertising on the Facebook platform.

160.    Meta owed Plaintiffs and members of the Classes a duty of protection from reasonably foreseeable harm.

161.    Meta owed Plaintiffs and members of the Classes a duty to exercise due care so as not to create an unreasonable risk of injury to Facebook users.

162.    Meta breached its duty by failing to use reasonable care in providing adequate warnings to Plaintiffs and members of the Classes, as set forth herein.

163.    Meta breached its duty to Plaintiffs and members of the Classes by failing to provide adequate or sufficient warning that would have placed Plaintiffs and members of the Classes on notice of the danger and prevented the harm.

164.    Meta's failure to warn Plaintiffs and members of the Classes, of the danger presented by advertisers who place fraudulent ads on the platform, demonstrates an egregious failure to exercise reasonable care.

165.    A reasonable company under the same and similar circumstances as Meta would have used reasonable care to provide adequate warnings to consumers, including Plaintiffs and members of the Classes.

166.    At all relevant times, Meta could have provided adequate warnings to prevent the harms and injuries described herein.

167.    Had Plaintiffs and members of the Classes received proper or adequate warnings about the risks of deceptive and fraudulent third-party advertisements as described herein, Plaintiffs and members of the Classes would have heeded such warnings.

168.    As a direct and proximate result of Meta's breach of its duty to provide adequate warnings, Plaintiffs and members of the Classes were harmed and sustained injuries set forth herein. Meta's failure to provide adequate and sufficient warnings was a substantial factor in causing harm to Plaintiffs and members of the Classes.

169.    As a direct result of Meta's negligent breach of its duty to warn, Plaintiffs and members of the Classes were unknowing and helpless victims of the deceptive and fraudulent advertising on Meta's products.

170.    The nature of Meta's deceptive and fraudulent acts that created harms, risks, and dangers that are not the type that are immediately apparent from using Meta's products. Plaintiffs and many members of the Classes are continuing to use Meta's products. When Plaintiffs and members of the Classes use Meta's products, they will not be independently able to verify whether Meta's products continue to pose an unreasonable risk or rely of Meta's representations in the future.

171.    Meta's conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and conscious and depraved indifference to the consequences of its conduct, including the exploitation of the platform's reach and targeting capabilities to defraud unsuspecting victims. The problem is compounded by the ease of posting, disseminating, sharing, and targeting deceptive and fraudulent advertisements and the financial incentives for Meta, which profits from advertising revenue.

172.    Plaintiffs and members of the Class and the Subclass demand judgment against Meta for injunctive relief and for compensatory damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for a judgment in its favor and in favor of the Classes as follows:

A.    Certifying this action as a class action, appointing Plaintiffs as Representatives of the Classes, and appointing Plaintiffs' undersigned counsel as Counsel for the Classes, under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding declaratory and injunctive relief, including but not limited to, the Proposed Injunctive Relief;

C.    Awarding Plaintiffs and other members of the Classes monetary compensation in the form of damages, and/or disgorgement of Facebook's unjustly earned profits;

D.      Awarding Plaintiffs and the Classes attorneys' fees and costs (including, without limitation, under Section 1021.5 of the California Code of Civil Procedure);

E.      Awarding Plaintiffs and other members of the Classes prejudgment and post-judgment interest; and

F.      Providing any and all further relief as the Court may deem just and proper.

<u>**JURY DEMAND**</u>

Plaintiffs request a trial by jury of all claims that can be so tried.

DATED: December 20, 2024                    **LEVI & KORSINSKY LLP**

By: */s/ Mark S. Reich*
Mark S. Reich (admitted pro hac vice)
Courtney E. Maccarone (admitted pro hac vice)
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: 212-363-7500
Facsimile: 212-363-7171
Email: mreich@zlk.com
          cmaccarone@zlk.com

Adam M. Apton (State Bar No. 316506)
**LEVI & KORSINSKY LLP**
388 Market Street, Suite 1300
San Francisco, CA 94111
Telephone: 415-373-1671
Facsimile: 212-363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiffs and the Proposed Classes*